IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 1:25-mj 562 |
| ABU KHAMZA,<br>    also known as Javokhir Norkobilov, | |
| MIRZOBEK BEKMURATOV, | |
|    and | |
| KAZI HAIDAR ALI, | |
|             Defendants. | |

AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT AND ARREST WARRANTS

        I, Christina Hagenbaugh, being duly sworn, depose and state:

        1.        I am a Special Agent with the Federal Bureau of Investigation ("FBI"), a position I have held since 2016.  I am currently assigned to the FBI's Washington Field Office. I have training and experience in the preparation, presentation, and service of criminal complaints and arrest and search warrants and have been involved in the investigation of numerous types of offenses, including crimes of terrorism (domestic and international), crimes against children and fraud.

        2.        This affidavit is submitted in support of a criminal complaint and arrest warrant for Abu Khamza, also known as Javokhir Norkobilov, and for Mirzobek Bekmuratov and Kazi Haidar Ali, for conspiring to engage in money laundering, in violation of Title 18, United States Code, Section 1956(h), and for conducting financial transactions to conceal or disguise the

nature, location, source, ownership, or control of property represented to be the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(3)(B).

3.     The facts set forth in this affidavit are based on information that I have obtained from my personal involvement in the investigation and from other law enforcement officers who have been involved in this investigation, on documents that I have reviewed, and on my training and experience. Where I have reported statements made by others or from documents that I have reviewed, those statements are reported in substance and in part, unless otherwise indicated. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.  When I refer to a specific date, time, or amount, I mean to refer to "on or about" such date or time, or "approximately" such amount.  Many of the communications referenced below were translated by the FBI from Russian or Uzbek to English.  For the sake of readability, and except as otherwise specifically indicated, all individuals referenced herein will be referenced as "he" and "him" rather than "he/she" and "him/her" without suggesting that such individuals necessarily are male rather than female.

<u>PROBABLE CAUSE</u>

I.     <u>Background of Defendants and Related Conspirators</u>

A.     <u>Ravshanjon Karimov</u>

4.     Records from U.S. Customs and Border Protection ("CBP"), the Department of State, and the Virginia Department of Motor Vehicles ("DMV") reflect that Ravshanjon Karimov is a 44-year old native of Uzbekistan who until recently resided in Fairfax, Virginia but now is in immigration custody pending the outcome of immigration removal proceedings.  During

immigration proceedings on April 9, 2025, Karimov acknowledged that he had not been employed for the past two years and, when needed, asked his mother (in Uzbekistan) for money.

5.      According to information obtained from the Government of Uzbekistan, Karimov was charged in Uzbekistan in absentia for his involvement in extortion and arson in 2022; for kidnapping and demanding a $10,000,000 ransom for the release of two other victims in March 2023; and for facilitating the armed robbery at the home of a fourth victim in 2024.

6.      WhatsApp messages backed up to Karimov's iCloud account obtained pursuant a search warrant also revealed that Karimov coordinated large scale financial transactions by utilizing various methods (cash pickups/drop-offs, wires, SWIFT transfers, crypto currency transfers) to conceal the nature, location and/or source of funds. For example, on September 7, 2022, one of Karimov's Russian-based conspirators ("C-9"), explained to Karimov over WhatsApp a scheme involving sending money to designated bank/debit cards for the money to then be withdrawn from ATMs. C-9 told Karimov that Karimov's cut would be 30 percent, but that C-9 required a deposit of $5000. C-9 further advised they would be wiring $10k-50k a day. Karimov told C-9 to go for it.

7.      On December 22, 2024, FBI personnel observed Karimov leave his residence in Northern Virginia, and travel to New York.  In New York, FBI personnel saw Karimov meet Khamza (and others) at a restaurant in Brooklyn, N.Y., and then return to his residence in Northern Virginia with several more bags than the one with which he originally left that morning.

8.      Records obtained from MGM Resorts reflect that Karimov gambled amounts far in excess of what reasonably could have been generated by his legitimate income.  For example, MGM records show that Karimov gambled (a) at the MGM casino at National Harbor every day between December 23, 2024, and December 30, 2024; (b) at an MGM casino in Atlantic City, New

Jersey, on three days in January 2025 before January 20, 2025; and (c) at the MGM casino at National Harbor every day from January 20, 2025, through January 24, 2025.

9.    According to the MGM records, between December 23, 2024, and January 24, 2025, Karimov used a total of $342,217.50 (currency and non-currency monetary instruments) to gamble and "cashed out" a total of $333,857.50 (currency and non-currency monetary instruments). The magnitude of Karimov's gambling activities is inconsistent with his employment history and is indicative of illicit proceeds and money laundering.

B.    Abu Khamza a/k/a Javokhir Norkobilov

10.    U.S. Citizenship and Immigration Services ("USCIS") records reflect that Abu Khamza is a 34-year old resident of Brooklyn, New York. According to those records, Khamza was born in Uzbekistan, and first came to the United States in 2015 under the name Javokhir Norkobilov. Immigration records reflect that Khamza became a naturalized U.S. citizen in July 2022 in Brooklyn, New York and, at that time, legally changed his name to "Abu Khamza."

11.    According to records associated with Karimov's WhatsApp number, Khamza was a frequent contact of Karimov as early as May 2020. According to cellular records on Khamza's WhatsApp number and Karimov's jail calls, Khamza and Karimov remained in contact, even after Karimov was detained by U.S. Immigration and Customs Enforcement on May 16, 2025.

12.    On July 11, 2023, Khamza and his associate, Eldoron Eshboev, were arrested by Fairfax County Police ("FCPD") in McLean, Virginia, for theft.[1]  During court proceedings in August 2023 at Fairfax County Courthouse, Khamza claimed that he made $2,000 per month working as a food truck driver.

---

[1] Accompanying Khamza and Eshboev were their associate, referenced herein as "C-19."

13.    In connection with Khamza's arrest, FCPD seized from him two cellular phones. Moreover, in 2024, CBP officers inspected Khamza in New York, upon his return to the United States from overseas trips.   In the course of his entries into the United States, CBP obtained extractions of five cellular telephones that were in his possession.   The FBI's examination of information acquired from the phones obtained by FCPD and CBP found evidence of a variety of illegal activities, including money laundering, extortion, loan fraud, and alien smuggling.

14.    For example, one of the phones contained communications about laundering stolen money.  In specific, on January 1, 2023, a co-conspirator in Turkey (referenced herein as "C-1") used WhatsApp to send Khamza photos of Euro bills in denominations of 20 and 50, as depicted below:



C-1 indicated that these were authentic bills stolen from ATMs, and that he knew people with 100 million of such bills, who would sell the bills in bulk for approximately half of their face value. According to communications found on the phone, C-1 told Khamza that the bank sprayed ink on the bills, and that the bills had to be cleaned in order to be used.

15.     Evidence of the March 2023 kidnapping for ransom scheme (described above, for which Karimov was charged in Uzbekistan) was found during the search of one of the cell phones seized from Khamza by FCPD.  The communications found in that phone ("Device 1") indicate that, between February 16, 2023 and March 9, 2023, Khamza helped Karimov coordinate taskings to facilitate the kidnapping for ransom scheme.

16.     One of the phones seized from Khamza by FCPD contained a screenshot of contact information for a moniker for Karimov that, on February 16, 2023, Khamza sent to C-1 (who, as noted above, in January 2023, discussed with Khamza laundering stolen money). That phone also contained a message from February 28, 2023, in which Khamza sent C-1 and a conspirator referenced herein as "C-2" contact information for each other. Examination of information from the phone showed that, a little over an hour later, Karimov contacted Khamza through WhatsApp.

17.     According to communications found on that phone, Khamza sent C-2 a virtual currency wallet and Telegram account information. This virtual currency wallet was the Ransom Wallet Address referenced in the Uzbeki Statement of Facts for one of Karimov's criminal cases, as the wallet that was intended to be utilized to receive ransom funds.  C-2 later told Khamza that "he" (referring, I believe, to the victims' family member from whom the ransom was demanded) did not pick up the phone.  Khamza and C-2 exchanged messages involving C-3, C-2 and Telegram users GGG regarding their attempts to make their ransom calls untraceable.

18.     According to communications found on this phone, ten minutes later, Khamza received from C-2 images of two phones covered in foil, apparently to prove that the phones that were utilized to conduct the ransom call would not be able to be tracked/detected by law enforcement because the foil would disrupt GPS and cellular signals.

19.     According to communications found on one of the phones seized from Khamza by FCPD, on or about March 10, 2023 (Eastern Time), Khamza exchanged numerous text messages with C-1 and C-2 that appear to reflect attempts to coordinate with Karimov following the kidnapping and attempted collection of ransom.  In the context of these messages, the presence of the Ransom Wallet Address among the messages found on Device 1 is compelling evidence that the messages relate to the same kidnapping that was referenced in documents provided by the General Prosecutor's Office of the Republic of Uzbekistan and the placement of Karimov on the Government of Uzbekistan's "Most Wanted List."

C.    Mirzobek Bekmuratov

20.     Records from the State of New York Department of Motor Vehicles ("DMV") reflect that Mirzobek Bekmuratov is a 26-year-old resident of Brooklyn, New York. Records from USCIS Services reflect that Bekmuratov was born in Uzbekistan and first came to the United States in 2012 as the child of a spouse of a U.S. citizen.  Bekuratov claims to operate a pharmacy in Long Island City, New York.

21.     In July 2022, Bekmuratov pled guilty in the Eastern District of New York to extortion and was sentenced in September 2024 to four years of probation.

D.    Kazi Haidar Ali

22.     Records from USCIS reflect that Kazi Haidar Ali is a 32-year-old resident of New York, New York.  According to immigration records, Ali was born in Bangladesh and derived U.S. citizenship in 2002.  Ali claims to be self-employed in the "event business."

E.    Information from CHS 1, Extortion, and Organized Crime

23.     According to widespread published sources, a Russian organized crime group is known as "Vor-v-Zakone," "the Vory" or the "Vors," which, as translated into English, refers to

"Thieves in the Night." See, e.g., https://www.themoscowtimes.com/2019/05/05/mark-galle -

ottithe-vory-russias-super-mafia-a65488. According to Wikipedia, "In the Russian mafia, "Vor"

(plural: Vory) (literally, "Thief") is an honorary title analogous to a made man in the Sicilian and

Italian-American mafia."  https://en.wikipedia.org/wiki/Russian_mafia#:~:text=  In  %  20the

%20Russian%20mafia%2C%20%22Vor,ability%2C%20intellect%2C%20and%20charisma.

24.     An Uzbek national who is now a resident of New York will be referenced herein as

"Confidential Human Source 1" ("CHS 1").  CHS 1 was the subject of a FBI criminal case in New

York in which CHS 1 was arrested for conspiracy to operate an unlicensed money transmitting

business and to commit bank fraud. CHS 1 has provided information to the FBI for over four years.

Much of CHS's reporting has been corroborated, and no substantive reporting by CHS has been

shown to be untrue.

25.     CHS 1 knew Khamza when Khamza worked for a New York-based driving service

in 2019 that was owned by associates of CHS 1. CHS 1 and Khamza had several mutual contacts,

including Karimov.  CHS 1 said that CHS 1 no longer associates with Khamza, because Khamza

failed to repay money he owed to CHS 1.

26.     CHS 1 said that Karimov has been involved in coordinating schemes to intimidate,

threaten, kidnap and/or carry out violent actions against individuals in and outside of the U.S. in

return for money, or to dissuade others from actions that might adversely affect him or his criminal

enterprise. CHS 1 said that, as of 2019, Karimov had connections with "Vors" ("made" members

of Eurasian Organized Crime known in Russian as "Vor-v-Zakone,") and was set to be named a

Vor in 2020. CHS further said that Karimov made recent claims he was a Vor.

27.     CHS 1 said in 2021 that Khamza paid Karimov $50,000 to have two cars burned in

Uzbekistan in retaliation for the issuance of a warrant related to Khamza's involvement in a fake

money order scheme. CHS 1 said that, in turn, Karimov paid someone else $30,000 to burn the cars in Uzbekistan. CHS 1's report is corroborated by the fact that, according Khamza's Google search history (obtained pursuant to a search warrant), in October 2023, he searched in Russian/Uzbek for "*2020 Tashkent cars set on fire*" on August 31, 2023 and "*8 march fire of cars in Tashkent*".

28.    A review of information from two phones found in Khamza's possession during the inspection by CBP on January 5, 2024 ("the January 5th Phone") and May 9, 2024 ("the May 9th Phone"), revealed that, between September 27, 2023 and October 7, 2023, Khamza, Karimov, and conspirators in New York known as C-4 and C-5, conspired to extort an Uzbek national who they believed owed $12,000 to an individual from Samarkand, Uzbekistan. Communications on the January 5th Phone reflect that C-4 sent Khamza photos of the individual from Samarkand victim with information that such individual owed the money, and that Khamza forwarded that information to Karimov.

29.    The January 5th Phone and information Apple records of Karimov's iCloud account revealed WhatsApp message exchanges between Khamza, Karimov and "C-6" between September 1, 2023, and October 10, 2023, regarding what appears to be a plan to extort money from another individual, who they believed had stolen $300,000 in Dubai. In the course of these communications, Karimov sent Khamza photos of both a Kazakhstan passport and an identification card from the United Arab Emirates for that individual. Khamza asked Karimov for more information about the theft, including the identity of the victim.

30.    According to the review of Khamza's phones and communications backed up to his iCloud obtained by search warrant, Khamza and his associates laundered the proceeds of

criminal activities including alien smuggling, unemployment insurance fraud and fraudulent loan applications.

    II.    Laundering Funds to Promote Alien Smuggling and Financial Crimes

        A.    Laundering the Proceeds of Check Fraud in December of 2024

    31.    Bank of America records reflect that, on December 23 and 24, 2024, 89 counterfeit checks totaling $87,922 were deposited through ATMs into the account of Khamza's company, JNB Trans Inc., of 3000 Ocean Pkwy, Apt 7P, in Brooklyn, New York.  By December 27, 2024, $87,284 was spent or transferred out of the JNB Trans account, including $12,475 to a Cash App account owned by Khamza (in his previous name of Norkobilov). That same week, Khamza then used that Cash App account to send $3,500 to Bekmuratov.

    32.    On December 22, 2024, FBI personnel observed Khamza, Bekmuratov, Karimov and others meeting in at a restaurant in Brooklyn on December 22, 2024.  Based upon Khamza's activities immediately following his meeting with Karimov, Bekmuratov, and others on December 22, 2024 and the fact that Karimov used a total of $342,217.50 (currency and non-currency monetary instruments) to gamble and "cashed out" a total of $333,857.50 (currency and non-currency monetary instruments) at MGM National Harbor and an MGM casino in Atlantic City, New Jersey (with Bekmuratov) between December 23, 2024 and January 24, 2025, I believe that the meeting on December 22, 2024 was to coordinate their check fraud and money laundering.

        B.    Alien Smuggling

    33.    Sending money internationally to promote a specified unlawful activity constitutes money laundering, in violation of 18 U.S.C. § 1956(a)(2).  Alien smuggling is a "specified unlawful activity.  18 U.S.C § 1956(c)(7)(A); 8 U.S.C. § 1324.

34.     According to records found on Device 1, between February 2023 and June 2023, Khamza and a conspirator referenced herein as "C-5" communicated via WhatsApp regarding the cost of smuggling Uzbek nationals from Tashkent to the U.S. through Turkey, Spain, Mexico.  For example, in June 2023, C-5 told Khamza to send him the tickets for C-19; Khamza then coordinated with Bekmuratov to book flights in Mexico for four Uzbek nationals, including C-19.

35.     On June 3, 2023, C-5 told Khamza that Khamza's 30-34 people crossed the border, but complained that C-5 had to borrow money to buy the tickets because Khamza did not fulfill his promise of buying the tickets.  Shortly thereafter, C-19 was apprehended attempting to enter the United States illegally from Mexico, and provided CBP a phone number and address associated with Khamza as his U.S. point of contact information.

C.  Laundering the Proceeds of Unemployment Insurance Fraud

36.     Engaging in financial transactions in the proceeds of specified unlawful activity for the purpose of concealing or disguising the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity constitutes money laundering.  18 U.S.C. § 1956(a)(1)(B)(i).  Using the internet to conduct unemployment insurance or loan fraud constitutes wire fraud and "specified unlawful activity."  18 U.S.C. § 1343; 18 U.S.C. § 1956(c)(7)(A); 18 U.S.C. § 1961(1).  Engaging in transactions involving more than $10,000 in the proceeds of specified unlawful activity constitutes money laundering.  18 U.S.C. § 1957.

37.     According to records found in Khamza's phones and his iCloud account obtained by search warrant, in July and August 2021, Khamza and "C-10" arranged to identify beneficiaries of California Prepaid Debit Cards for Unemployment, Disability and Paid Family Leave Benefits; submit fraudulent claims that the cards of at least some of these beneficiaries were lost or stolen; submit fraudulent address changes to addresses controlled by Khamza/Khamza's associates in

Brooklyn, New York; to withdraw funds from the accounts of those beneficiaries; and launder the illegally procured funds. Through use of the debit cards, Khamza and his associates made ATM withdrawals in Brooklyn, New York and Newark, New Jersey, totaling over $113,000.

38.     For example, Khamza received from C-10 a photograph of three names, including the name of Victim 10, a registrant of an unemployment account profile on Bank of America systems.  Khamza also possessed in his iCloud account photographs of a Bank of America debit card belonging to "Victim 10".  On August 1, 2021, the address for the account was changed from an address in California to an address on East 23rd Street in Brooklyn, New York that I believe was used by Khamza/Khamza's associates, and a new debit card was issued for the account.  Between August 11, 2021, and September 7, 2021, $22,700 in unemployment insurance benefits was withdrawn from the account of Victim 10 through ATMs in Brooklyn.  Bank of America closed the account in October 2021 for fraud.

39.     According to records obtained from Bank of America, between July 20, 2021 and August 16, 2021, 57 cash withdrawals totaling $56,100 were made through ATMs in Brooklyn, New York, from the accounts of purported recipients of California unemployment insurance benefits.  During that same period, Khamza arranged to send at least $14,000 to C-10 directly and through C-10's associates (primarily based in Russia). Based upon the timing of the transactions, I believe they are the proceeds of Khamza and his associates fraudulently procuring cash withdrawals from the referenced victims' CA EDD accounts.

40.     According to records found on Khamza's phone, between August 13, 2021 and August 16, 2021, C-10 sent Khamza photographs of C-10's driver's license and passports associated with Armenian nationals, and an image of a separate Armenian passport. According to images of Western Union receipts saved to Device 1, Khamza's associates, C-8 and C-11, sent at

least $10,000 to the individuals associated with the referenced Armenian passports between August 13, 2021 and August 16, 2021.  According to communications from the Jan 5th Phone, on August 17, 2021, Khamza notified C-10 that $30,000 was sent to the brothers as they had previously discussed and "yesterday $18,000 from one day's worth, let $10,000 be with you brother." Khamza advised C-10 to send $30,000 to the guys and they would close out the deal like they discussed. On August 20, 2021, Khamza sent an image of a spreadsheet listing locations the last names of five victims of the California unemployment insurance fraud scheme, along with amounts that I believe were the balances associated with each of the victim's debit card accounts.

### D.  Laundering the Proceeds of Pandemic Relief Loans

41.    New York law requires most employers (such as trucking companies) to report their payroll on a quarterly basis to the New York State Department of Labor.  Between 2019 and 2023, no wages were reported to the New York State Department of Labor for any employees associated with the employer identification number ("EIN") later provided by Khamza to the U.S. Small Business Administration ("SBA") on behalf of JNB Trans Inc.

42.    SBA records reflect that on July 1, 2020, Khamza applied for an EIDL loan, and indicated that he had two employees.  In the application, Khamza identified his primary business address as located in Brooklyn, New York, and asked that the EIDL loan funds be sent to a Bank of America account that, according to Bank of America records, was in the name of JNB Trans Inc., with Khamza as its President.  Bank of America records reflect that the JBN Trans Inc. account received $126,800 in EIDL loan proceeds between August 31, 2020 and July 21, 2021 and that, in between July 2021 and December 2021, more than $40,000 was transferred to Khamza's personal Bank of America checking account.  SBA records reflect that only $1200 of that EIDL loan was repaid, and the loan ultimately was charged off.

43.     On January 21, 2021, a separate application was submitted to the SBA for an EIDL loan in the name of "JNB Trans inc".   According to that application, the business had 40 employees.  Although the owner of the company was identified as "Chin Ree", Khamza appears to have been involved in the submission of this application because the loan funds were sought to be transferred to a Bank of America account controlled by Khamza. SBA denied the loan application for failing online identity verification.

44.     On March 7, 2021, Khamza submitted to the SBA another application for an EIDL loan on behalf of "JNB Trans Inc." On this application, Khamza claimed that he had 12 employees. This application was denied as the business did not appear to have an online presence and the phone number provided was not registered to a known entity.

45.     Khamza's phones also contained records of multiple SBA loan applications submitted by his associates.  For example, on July 13, 2021, an individual in Uzbekistan referenced herein as "C-7" sent Khamza screenshots of paperwork to include an SBA Loan Authorization for an EIDL loan application in the amount of $246,250 for "Startway Express LLC aka Starway Express LLC."  In September 2022, SBA ultimately charged off that loan, and later notified an individual that his identity had been used without his knowledge to obtain that loan.  On July 22, 2021, C-7 had sent Khamza a message about a tip alleging that Startway filed fraudulent loan applications, and told Khamza to ask "them" if they really wanted to have problems. In light of these facts, I believe that C-7, Khamza and others used someone else's identity to file for the Startway loan and that, when C-7 and/or other conspirators did not receive what they believed was their fair share of the loan proceeds, he (or they) threatened to file a tip with SBA regarding the fraudulent loan application associated with Startway.

46.     In September 14, 2021, Khamza received from C-7 a screenshot of a message string indicating the filing of a SBA loan application for $500,000 for a company named JMUZ Services Inc. SBA records indicate that an application was submitted on September 15, 2021, for JMUZ Services, Inc, with a street address in Brooklyn, New York, that was used by Khamza in connection with a fraud against the California Unemployment Insurance Program, as explained above.  Later, Khamza received from C-7 an image confirming a SBA loan to JMUZ Services in the amount of $485,800.  SBA records, however, reflect that the loan was declined because SBA could not verify the existence of an eligible business as reflected in the application.

III.     Laundering of Money Represented to Be Proceeds of Insurance Fraud

47.     In a recorded meeting on August 26, 2024, Khamza first met "CHS 3" in-person in Brooklyn, N.Y.[2] During this meeting, Khamza said that he was involved in multiple businesses, including cryptocurrency. Khamza said that he collected a commission of between one and four percent for connecting Bitcoin purchasers and sellers.

48.     On December 22, 2024, Khamza and CHS 3 met in-person in Brooklyn, N.Y. Khamza discussed a complex financial transaction and characterized it as looking like it was legal, even though it was really illegal.  Khamza and CHS 3 agreed they did not care about legal or illegal, but rather halal or haram and the rules of Allah. Khamza and CHS 3 discussed transfers of money.  Khamza recommended buying USDT[3] because the interest rate was low and the transactions could not be tracked. Khamza advised CHS 3 to go to someone using USDT, give that person cash, and they would send it where CHS 3 wanted. Khamza assured CHS 3 that everybody

---

[2] Except as specifically stated otherwise, all conversations between CHS and Khamza were recorded, and all text messages preserved.

[3] USDT is a type of cryptocurrency, which is a stablecoin. Stablecoins seek to maintain a stable value by pegging their market value to an external reference, such as a fiat currency like the U.S. dollar, a commodity such as gold, or another financial instrument.

that was trying to conceal their money and didn't want their money to be tracked was doing it like that. Khamza told CHS 3 to let Khamza know if CHS 3 needed USDT because Khamza could do the transfers, and that Khamza would charge a commission of only one or two percent.

49.     On December 23, 2024, CHS 3 and Khamza met again in Brooklyn. CHS 3 brought up the difficulty in sending money to the Middle East and being flagged when attempting to do so. Khamza claimed it was easy to send money to the Middle East and said that he could send money to any country CHS 3 picked on a map. Khamza said that CHS 3 was paying too much, and offered to help send money for CHS 3 via USDT if CHS 3 had someone that could receive USDT there. Khamza assured CHS 3 sending via USDT was easy and could not be tracked. When questioned about the trustworthiness of his associates that would be involved in sending the funds, Khamza assured CHS 3 he trusted the people he worked with and explained they could be trusted because they had an interest and were also making money. Later, Khamza explained because he has a lot of connections, his primary role in deals is as a middleman. Khamza claimed if the person he is working with is Muslim, he will do it for free. Khamza offered to show CHS 3 what they have in their account and advised CHS 3 that every week, more than $10 million dollars goes in and out of the account.

50.     When CHS 3 asked about the process of converting cash to USDT, Khamza said that if it was not clean money, they say to send it to USDT different ways, including giving cash, sending to their account, getting USDT and via wire. Khamza further stated the best markets to buy USDT are in Singapore, Hong Kong, and Malaysia because they don't ask about the source of the money.

51.     CHS 3 and Khamza discussed methods for cleaning money, including paying a commission for issuing a check for cash. Khamza advised he had done this and had associates

that are currently doing so. Khamza said they have a lot of companies, and no one questioned these companies' actions. Khamza said he previously moved a weekly amount of $25,000 to 50,000 in three days for one company. Khamza claimed he had been in this business for ten years and knew how it worked, who was involved and they had a lot of companies that were not tied to him; rather the owners of the companies were not there [in the U.S.].

52.    On January 24, 2025, a Government-controlled wallet with an address ending in "PuqYseJ" was created in Manassas, Virginia by an FBI Special Agent.

53.    On February 20, 2025, CHS 3 and Khamza met in-person in Brooklyn.  During this meeting, CHS 3 said that he worked with someone who was involved with an insurance scam. CHS 3 said that his associate operated pharmacies in undesirable locations where they arranged to have people obtain prescription pills that they sold off-market.  CHS 3 explained that a prescription of pills obtained for $8 to $10 with insurance could be sold for $500 or $600 on the street.  CHS 3 said that his associate is bringing in so much cash that the guy does not know what to do with it. Khamza claimed that he knew someone that did the same type of scam in New York, but that the woman received 20 years in jail and is still in jail now.

54.    CHS 3 shared that the guy donates a lot of the money to the brothers and then sends the rest of the money to the guy's accounts overseas. CHS 3 stated that transferring the money back home has been the hardest part for his associate. CHS 3 stated the guy does big amounts and the problem is finding the right people to trust.

55.    Khamza inquired about the amount of money and how frequently the transfers were taking place, because if it is a big amount, he would do it a different way. CHS 3 stated that if the process works as well as Khamza explained, there will be a lot of money. CHS 3 indicated they can break the funds up in whatever manner CHS 3 and Khamza are comfortable.

56.     Khamza inquired how CHS 3 would bring cash to New York. CHS 3 pulled money from a bag and showed it to Khamza, explaining that the money was $10,000.  When Khamza indicated that it was a small amount, CHS 3 agreed, but said that they have to test it first.  CHS 3 told Khamza that if the $10,000 works, they will do ten times that amount, $100,000, next time and the time after that. Khamza indicated that he needed to make a call.

57.     Khamza said that he gets the money first, makes a call to the customer and asks if they have money and USDT and if they say yes, then he takes the money. Khamza said that he does not take the money before. CHS 3 asked about the percentage and how it works. Khamza replied that it would be 2%, 1%, or 1.5%. Khamza indicated that $10,000 was 2% to 3% and more than $100,000 was 1% or 1.5%.

58.     Khamza indicated that if they want to do business regularly, they can order USDT. Khamza explained if they are going to do this weekly, they need to order the USDT one day before. Khamza stated that CHS 3 would need to give him the wallet address and they will send a test of $10 first to make sure the address is correct. Khamza stated that his guy will then send the rest of the money and Khamza will take the cash.

59.     After making a few phone calls, Khamza and CHS 3 agreed to complete the transaction the following day.

60.     Khamza inquired if the CHS 3 can do a wire transfer. CHS 3 explained that the money was dirty money in cash and suggested that if it was a wire transfer in a bank then they would not worry about it because clean money is not a problem to transfer. Khamza agreed.

A.     <u>February 21, 2025 Money Laundering Test Transaction - $1,000</u>

61.     On February 21, 2025, Khamza suggested by text message that if CHS 3 wanted, Khamza would send CHS 3 $1,000 so the CHS 3 could see how the process worked, instead of

the previously discussed $10,000.  CHS 3 agreed and asked Khamza how Khamza wanted to do it. Khamza advised CHS 3 to send him a wallet. CHS 3 sent the wallet, ending in PuqYseJ, to Khamza via text messaging.

62.     Later the same day, Khamza and CHS 3 met in-person in Brooklyn, N.Y. Khamza said they would have to bring the cash to the money person at an office, since they were worried about being robbed. Khamza assured CHS 3 his people have the money to engage in such transactions and showed CHS 3 an account balance on his phone reflecting a 28,000,000 USDT balance.  Khamza again brought up the possibility of utilizing wire transfers, but CHS 3 reiterated the money was dirty and could not be put into a bank to conduct a wire transfer. CHS 3 further reiterated that their associate got the money from guys on the street selling pills and if the money were put into a bank, their associate would get tagged. CHS 3 added that because of where the money was going, it was important that the money could not be tracked.

63.     Khamza advised CHS 3 to be careful since the government was hunting people selling USDT because it was used for laundering.  CHS 3 explained that he fought with the brothers that the guy is sending the money to overseas.

64.     CHS 3 pulled out two separate amounts of money and handed it to Khamza. CHS 3 indicated that he was giving Khamza $1,000 for the USDT Khamza sent to the wallet that CHS 3 provided. CHS 3 then stated that he loves Khamza as a brother but that Khamza's expenses have to be paid and insisted Khamza take payment when Khamza attempted to decline. Khamza indicated that he did not want to accept the money because of their relationship. CHS 3 explained to Khamza that the money was for Khamza's expenses and that it was not much. Khamza accepted the money and thanked CHS 3.

65.    CHS 3 advised Khamza that he would set up the transaction for the next time and would let Khamza know. Khamza advised CHS 3 to let him know how much and how many days they want to do it because then his people would be ready.

66.    On February 21, 2025, an FBI Special Agent in Arlington, Virginia, accessed the account associated with Government-Controlled wallet and confirmed this wallet received 1000 USDT.

67.    WhatsApp communications obtained by search warrant from Karimov's device revealed that, that same day, Khamza sent Karimov the referenced wallet address, and then Karimov sent Khamza an image confirming that a 1,000 USDT transaction was sent to the referenced wallet. On May 16, 2025, pictures of seed/recovery phrases were discovered within the Notes app of a device recovered by search warrant from Karimov's residence. One of the cryptocurrency wallets that was reconstituted using the seed phrases contained the TRON "mEbWJ" address that sent the 1,000 USDT transaction to the government-controlled wallet address ending in PuqYseJ.

68.    Between February 27, 2025 and March 3, 3025, CHS 3 and Khamza coordinated via text messages and voice calls to set up a meeting to launder $100,000 on March 4, 2025.

69.    On March 4, 2025, CHS 3 conducted two telephone calls and exchanged text messages with Khamza discussing details related to their planned meeting for later in the day.[4] Khamza said that he was using a Russian for the deal and the percentage would be 4%. Khamza advised he could do it for 2% if CHS 3 could wait until the following day so Khamza could use his other guy, but CHS 3 indicated that doing it that day was fine.  Subsequently, Khamza texted

---

[4] One of these calls (March 4, 2025, 12:12 PM call), was not consensually recorded but a contemporaneous summary of the call was documented.

CHS 3 the address to meet at a restaurant in Brooklyn. At 6:05 PM, CHS 3 met Khamza, Khamza's friend, Bekmuratov, and Bekmuratov's brother, at the referenced location. After eating and socializing, Bekmuratov said that they needed to go to a different location for the transaction, which was 40 minutes away.

70.     Outside the presence of Bekmuratov and Bekmuratov's brother, CHS 3 asked why they were involved.  Khamza said that Bekmuratov knew about all of the processes and Khamza was working with him. Khamza explained that the guy he had initially coordinated with wanted them to drop the money off and would send the transactions the following hour. The individual did not want to count the money with CHS 3 present, so Khamza decided to use someone different. When asked if the people he was working with knew the full story of where the money came from and where it is going, Khamza indicated that they did not, and advised CHS 3 not to tell them. When asked if the contact would take the cash and execute the transfer at the same time, Khamza responded affirmatively. Khamza reiterated that the CHS 3 would receive the money right away.

71.     Khamza asked CHS 3 to confirm the amount needed in crypto and CHS 3 indicated it would be 100,000 minus the commission taken out. Khamza explained the first time would be strict but that after one or two times, the process would be easier. When CHS 3 explained that he wanted to work only with Khamza because of the potential for trouble caused by the involvement of others, Khamza said that he had previously trusted Bekmuratov with more than $2,000,000. Khamza said that he would not introduce CHS 3 to someone he did not trust and would not set up a risky deal. Khamza indicated that he was doing this for CHS 3 because of their relationship and explained that if it did not feel good, CHS 3 could let Khamza know.

72.     After departing the restaurant separately, Khamza sent CHS 3 the address for the meeting location, on Saunders St. in Rego Park, N.Y. Upon arriving at the referenced location, Bekmuratov indicated that the money needed to be taken upstairs without CHS 3, and thereafter the crypto would be sent. However, CHS 3 advised he could not do that and said that the process Bekmuratov was describing was different than what was described by Khamza. Bekmuratov attempted to convince CHS 3 of the process he described and advised CHS 3 that his associates were scared because they could get locked up for what they were doing, which Bekmuratov noted was "money laundering." Ultimately, CHS 3 did not agree to the terms, the transaction did not occur that evening, and CHS 3 and Khamza agreed to talk later.

B.     Underline March 5, 2025 Money Laundering Transaction - $95,000

73.     In the early morning of March 5, 2025, Khamza and CHS 3 discussed by phone how they were misinformed by Bekmuratov regarding the transaction procedures; Khamza suggested they do the transaction that day. Khamza said that he found a different individual to do the transaction for CHS 3 later in the day, for a reduced amount of $40,000. Khamza indicated the transaction would take place after lunchtime and they agreed to talk closer to the meeting time.

74.     Shortly after noon, Khamza called CHS 3 and advised he found someone to complete the money transaction for the full $100,000, and confirmed the money person would sit in the car with CHS 3 and do it the way that the CHS 3 and Khamza discussed previously.[5] However, Khamza advised the guy would first take a stack of $10,000 to the bank to ensure that the bills were real. CHS 3 agreed to the terms and Khamza confirmed he would be present for

---

[5] This call was not recorded, but a contemporaneous summary was provided by CHS 3 to the FBI.

the meeting. Thereafter, Khamza texted CHS 3 the meeting location address on East 24th Street in Brooklyn, and they agreed to meet there at 3:00 p.m.

75.     Shortly after 3:00 p.m., CHS 3 met Khamza in Khamza's vehicle, near the address on East 24th Street.  Five minutes later, an individual referenced herein as "C-18" met Khamza and CHS 3 in Khamza's vehicle. After CHS 3 provided C-18 with the first roll of $10,000 in hundreds, C-18 counted and confirmed it was good.  C-18 proceeded to count the remaining $90,000. Khamza said that he had sent to C-18 CHS 3's wallet address, used for the last transaction that occurred on February 21, 2025, but CHS 3 texted the wallet address to Khamza again. Once C-18 counted the remaining cash, they discussed how much USDT needed to be sent to CHS 3's associate's wallet. CHS 3 explained that $95,000 would be sent, $4,000 would be the commission for C-18 and/or his accomplice(s) and $1,000 would go to Khamza. Khamza declined to take the $1,000 in cash and said that C-18 would send it to him as USDT.

76.     C-18 conducted a test transaction of 2.6 USDT. Once CHS 3 received confirmation the transaction had been completed, C-18 sent 95,000 USDT to the same wallet address. After CHS 3 received confirmation the transaction had been completed, C-18 collected the rolls of cash amounting to $100,000, put them in his backpack, and exited the vehicle with Khamza. When Khamza returned to the car, he said C-18 wanted to do more work with CHS 3. CHS 3 reiterated the importance of doing things safely since there was much at stake, and indicated that it was not just his own life, but also the well-being of the brothers overseas and all the other people involved.

77.     Khamza tried to give CHS 3 $400 back because C-18 gave it to him and CHS 3 had also given him $1,000, but CHS 3 declined. Shortly thereafter, CHS 3 showed photos, displayed on the CHS 3's phone, to Khamza depicting CHS 3 and associates in the desert

23

holding weapons, wearing tactical attire, holding up a raised index finger, (a reference to tawheed, and a gesture adopted by ISIS), and holding an ISIS flag. CHS 3 scrolled quickly through the photos and explained that if Khamza had any trouble with the guy while he was in Dubai, to reach out to CHS 3 because CHS 3 had brothers over there and would do anything for Khamza. CHS 3 advised that these people would come after anyone, which was how they protected their circle. CHS 3 advised Khamza that the brothers depicted were the brothers that were expecting the money from CHS 3.

78.     On March 5, 2025, an FBI Special Agent accessed the account associated with the government-controlled wallet in Arlington, Virginia and confirmed this wallet received 95,002.6 USDT in two transactions.

79.     In a call on April 13, 2025, CHS 3 and Khamza discussed setting up another money transaction for the upcoming week on or about Wednesday (April 16, 2025) for the same amount ($100,000 minus commission) as last time.

C.   April 16, 2025 Money Laundering Transaction - $95,040

80.     On April 16, 2025, CHS 3 met Khamza in Brooklyn, New York.   While discussing one of his money laundering schemes, Khamza suggested  that he could find and use companies and corresponding accounts to launder money by wiring the funds to CHS 3's account as clean money and  the money could then be utilized to send overseas and suggested that CHS 3 choose USDT.  When CHS 3 asked how smaller amounts would be sent to Dawla, later clarified as brothers in Syria, Khamza advised CHS 3 to not tell him that side. Khamza advised that he did not want to know and suggested that CHS 3 would be watched for sending money there. Khamza stated that he could clean the funds for CHS 3 but did not want to know more about that side.

81.     Later that afternoon, CHS 3 and Khamza drove to meet C-18.  Khamza said that he used C-18 as a last resort because the percentage that he charged was high. Khamza indicated that he contacted another person who would have completed the deal for two percent commission, but that person was not sure if they would have the total amount of USDT needed for the transfer. Khamza stated that he wanted to open an office where he would have the ability to use spyware or an electronic scanner to check everyone that comes into the office.

82.     When C-18 joined CHS 3 and Khamza in CHS 3's vehicle, CHS 3 and Khamza discussed the cryptocurrency wallet and confirmed the wallet address was the same as the previous transfer.  After C-18 counted the $100,000, CHS 3 requested C-18 take 1,000 out of the funds counted and asked Khamza to count the funds for him. When Khamza finished counting the $1,000, Khamza set the funds in the center cupholder. The remaining $99,000 in cash was transferred from CHS 3's backpack to C-18's backpack. C-18 showed CHS 3 and Khamza his phone calculator and conducted a real time calculation subtracting his 4% commission from $99,000 to show the amount of $95,040 that he would send via cryptocurrency to CHS 3's associate's wallet and CHS 3 agreed with the amount. CHS 3 inquired about conducting a test transaction. Khamza spoke with C-18 and initially advised that they would not do a test transaction because they had already done one before. However, C-18 later agreed to do a test transaction first.

83.     Shortly after 5:00 p.m, C-18 showed CHS 3 his phone screen and asked CHS 3 to confirm the money was received. CHS 3 confirmed the test transfer of $10 was received. CHS 3 asked Khamza to inquire if C-18 could do another transfer Monday or Tuesday of the following week. Khamza explained that C-18 can do Tuesday or Wednesday. CHS 3 asked if C-18 initiated the main transfer and C-18 advised he sent it, but was waiting for confirmation. Shortly

thereafter, C-18 showed CHS 3 and Khamza the confirmation screen on his phone. C-18 spoke with Khamza and after a few minutes CHS 3 shook hands with C-18 to confirm the main transfer was received. C-18 exited the vehicle with his backpack containing the $99,000 in cash from CHS 3. CHS 3 gave Khamza the $1,000 that he previously counted and had put in the cupholder for facilitating the transfer.

84.    On April 16, 2025, an FBI Special Agent accessed the account associated with the government-controlled wallet in Falls Church, Virginia, and confirmed this wallet received 95,040 USDT in two transactions.

85.    Between April 19, 2025 and April 24, 2025, CHS 3 and Khamza exchanged text messages and calls coordinating the next money transaction for the same amount ($100,000 minus commission) that they ultimately scheduled for the afternoon of April 24, 2025.[6]

D.    April 24, 2025 Money Laundering Transaction - $95,000

86.    On April 24, 2025, Khamza told CHS 3 by phone that Khamza had another associate who was prepared to complete the full transfer amount for CHS 3. Khamza explained that the associate, later identified as Kazi Haidar Ali, would come to the car, count one pack of money, and then send the entire amount of cryptocurrency funds as requested. After further coordination via WhatsApp text messages, CHS 3 and Khamza settled on meeting Ali at 3:00 PM that day in CHS 3's car near an address on Hanover Street, in New York, N.Y., and the commission would be 3.5%.

87.    Shortly before 3:00 p.m., CHS 3 and Khamza met in CHS 3's car near Hanover Street in New York, N.Y. CHS 3 sent Khamza an Ethereum address for a government-controlled

---

[6] A WhatsApp call between CHS 3 and Khamza on April 22, 2025 was not recorded, but a summary of the call was documented contemporaneously.

wallet (ending in "f0C17"). A few minutes later, Ali entered CHS 3's vehicle, and asked CHS 3 and Khamza the total amount to be transferred. Khamza confirmed with CHS 3 that the total transfer amount was $95,000. They discussed the new Ethereum address, and Khamza shared it with Ali. Ali confirmed that he would send a test amount first prior to sending the full amount. CHS 3 reiterated that he needed to send $95,000, and asked Ali to add his percentage on top of that. Ali said that he would send a $10 test transaction, confirmed the wallet address with CHS 3. Ali calculated and advised it would be $98,325 including his percentage (3.5%). Khamza and CHS 3 agreed with the amount calculated.

88.    Initially Ali said that he would only count the first roll of cash, but at the urging of CHS 3, Ali counted all the cash with the assistance of Khamza. CHS 3 said that $1,675 would be deducted from the $100,000 (based upon the amount that Ali was sending to his/her associate's cryptowallet, $95,000, and Ali's percentage, $3,325). Khamza and CHS 3 told ALI that there was $8,350 in addition to nine stacks each containing $10,000 that would be provided to him, amounting to $98,350. Ali said that he did not need to be provided the additional $25. Ali and CHS 3 agreed Ali would send the additional $25 to Khamza thereafter.

89.    Ali asked Khamza to confirm the amount in one of the stacks, which Khamza said was $8,350. Ali confirmed the $8,350 along with nine stacks of $10,000 would be needed. Ali counted and confirmed there were nine stacks. When Ali asked if the last stack was counted and Khamza offered to count the last stack of $10,000, CHS 3 agreed it should be double checked. Ali confirmed he had the total amount pending the count on the last stack, was sending 95,000 via cryptocurrency and asked CHS 3 to confirm the wallet address. CHS 3 confirmed the amount and wallet address. Khamza confirmed the count on the last stack. ALI initiated the transfer and advised he would wait until it cleared.

90.     CHS 3 asked Ali how soon Ali would be able to complete another transaction. Ali said that he would be able to do another $100,000 at any time that CHS 3 needed, and suggested that they could do another in that moment. CHS 3 asked Khamza if he and Ali were able to complete another transaction the following Friday, and if they were able to increase the amount to $150,000.  Ali indicated that CHS 3 would need to give him two days advanced notice to complete the transaction. Ali asked CHS 3 to check to see if CHS 3's guy received the $95,000 transaction. Shortly thereafter, CHS 3 confirmed the transaction was received.

91.     After Ali departed, Khamza told CHS 3 that deals with Ali were always simple and easy. Khamza said that C-18 was Khamza's last resort because his commission was too high. Khamza said that, if they did business with Ali again, Ali would complete the transaction for a commission of 2.75 percent.  Khamza said Ali has a lot of companies and could do wires, checks or ACH to his accounts for commission of 2%.  Khamza said that Ali was able to do large transaction amounts up to $2,000,000 to multiple accounts and was comfortable doing so because he does it often. Khamza said that he had done $500,000 transactions with Ali in his office.

92.     CHS 3 provided Khamza $1,650 for facilitating the $95,000 transaction they had just completed. Thereafter, Khamza described another scheme he was considering, which entailed leasing cabins in the Poconos via Airbnb for $4,000-5,000. Khamza indicated that he has guys that would send him money under the guise that they were booking the Airbnb from him. Khamza advised that the Airbnb would be purchased under someone else's name and would be free within eleven months. Khamza advised that he would start with one and then add on additional homes. Khamza indicated that he knew the people who would book the Airbnb from him already. I believe this scheme is another method for Khamza to launder money.

28

93.     On April 24, 2025, an FBI Special Agent accessed the account associated with a government-controlled wallet in Arlington, Virginia, and confirmed that this wallet received 95,010 USDT in two transactions.

94.     On April 29, 2025, CHS 3 exchanged WhatsApp text messages with Khamza to coordinate setting up a meeting to conduct a $150,000 transaction on May 2, 2025.

E.      May 2, 2025 Money Laundering Transaction - $143,750

95.     On May 2, 2025, Khamza texted CHS 3 indicating they would be doing the transaction with C-18. Thereafter, in a phone call, Khamza confirmed that the transaction would be the full amount of $150,000.  That evening, CHS 3 picked up Khamza in his car. While they waited to hear from C-18, Khamza had three phone calls in Uzbek/Russian, which were later translated and I believe consisted of calls to coordinate a robbery of C-18. Khamza advised his associate to give his other associate something to cover his face, to have two people jump at the bag because the guy is strong and advised "he" [C-18] was running late. Khamza instructed his associate to come out when he [Khamza] is gone, otherwise he would have to get involved. Khamza told his associate to use a total of four people and divide the money into four parts and noted to give one part to "him." Khamza also confirmed that they had something sharp with them.

96.     When CHS 3 asked why they did not work with Ali, who appeared to be more reliable, Khamza said that Ali was in Argentina, and they would set the deal up with him the next time.  Khamza agreed that Ali was better, and they would work with Ali in the future. Khamza stated that he told C-18 that he needed to do the deal for 3.5 percent and stressed to C-18 that he had other options and had chosen to work with him. Khamza indicated that C-18 agreed to do the deal for 3.5 percent instead of the four percent that he had previously done.

97.     At 7:20 p.m., Khamza spoke on the phone to C-18 and then told CHS 3 that C-18 would be ready to complete the transaction in 40 minutes. At 8:15 PM, C-18 joined CHS 3 and Khamza in CHS 3's car. CHS 3 sent his Tron wallet address to Khamza, who in turn forwarded it to C-18. Khamza confirmed C-18's percentage was 3.5 per cent. CHS 3 produced the $150,000 in cash from his/her backpack and advised C-18 to do it the same way as last time, by putting the counted rolls in the front pocket of the backpack. C-18 started counting the cash.

98.     CHS 3 requested that C-18 send $143,750 to the cryptocurrency wallet provided. Khamza confirmed the amount that would be sent to the wallet CHS 3 provided ($143,750) and the amount that would be provided to C-18. CHS 3 asked if C-18 wanted to send a test transaction, but Khamza said he did not. C-18 confirmed that he initiated the crypto currency transaction. CHS 3 said he CHS 3 would confirm with his/her associate if the transfer was received. Khamza advised CHS 3 that C-18 needed an additional $31 and an additional $50 bill was provided to C-18. CHS 3 provided C-18 a total of $148,800 in cash and CHS 3 confirmed receipt of the cryptocurrency transaction.

99.     CHS 3 inquired if C-18 could complete another transaction the following week and be sure about it. Khamza told CHS 3 that C-18 stated that he was doing his best to make the money transactions happen. CHS 3 advised C-18 that if he could do the following Friday or Saturday to let them know and if C-18 could not, CHS 3 advised it was okay.

100.     At 8:51 PM, C-18 exited CHS 3's vehicle with the referenced cash in his backpack. After C-18 exited the vehicle, CHS 3 provided Khamza the remaining $1,200 for facilitating the referenced transaction.

101.     As CHS 3 was driving Khamza back to his residence, Khamza advised CHS 3 that if they opened a business together, they would be able to wash funds through the business.

Khamza advised that he opened a wholesale company and advised CHS 3 if he needed something, the commission charged was cheap at two percent. CHS 3 told Khamza that he promised his guy a specific amount of money to be transferred and needed to complete the amount promised. CHS 3 suggested that Khamza let CHS 3 know about the next deal and Khamza suggested that ALI was ready and Khamza advised he would confirm.

102.    On May 2, 2025, an FBI Special Agent accessed the account associated with a government-controlled wallet in Falls Church, Virginia and confirmed this wallet received 143,750 USDT from an account.

103.    Between May 5, 2025 and May 8, 2025, CHS 3 and Khamza exchanged several calls and text messages to coordinate their next meeting, which they ultimately scheduled for May 9, 2025 with C-18 in Brooklyn.

104.    On May 8, 2025, FBI personnel observed Karimov driving to 3000 Ocean Parkway, in Brooklyn, with Khamza as a passenger.

F.   May 9, 2025 Money Laundering Transaction  - $143,250

105.    On May 9, 2025, CHS 3 picked-up Khamza from 3000 Ocean Parkway in Brooklyn, and started drove to the meeting location near East 24th Street in Brooklyn. About 12:30 p.m., C-18 joined Khamza and CHS 3 in CHS 3's vehicle, and later started counting the money CHS 3 brought.

106.    Khamza and CHS 3 confirmed the amount to be sent was $143,250. C-18 counted the number of rolls he already counted. Khamza assisted C-18 in counting the remainder. Khamza asked CHS 3 about the wallet address and CHS 3 inquired if the address needed to be sent again. C-18 requested that CHS 3 resend the wallet and Khamza confirmed he already had it

and would send it to C-18. C-18, Khamza, and CHS 3 confirmed the cryptocurrency wallet address.

107.     Khamza asked if CHS 3's contact confirmed the cryptocurrency was received and CHS 3 said his/her contact was checking. CHS 3 shook hands with C-18 and confirmed receipt of the cryptocurrency.  Shortly after 1:00 p.m., C-18 exited the vehicle with $148,300 in cash. CHS 3 gave Khamza the remaining $1,700 for facilitating the referenced transaction and said may Allah bless Khamza and his family.

108.     FBI physical surveillance and video footage revealed that, as C-18 walked towards his residence with a black backpack from the meeting location, a black four door sedan pulled in front of C-18, where three masked individuals exited the vehicle with baseball bats; thereafter C-18 was observed without the black backpack heading west.

109.     Moments after C-18 left CHS 3's vehicle, Khamza received a phone call from C-18 and spoke in Uzbek/Russian.  Khamza told CHS 3 that C-18 had been robbed.

110.     On May 9, 2025, an FBI Special Agent accessed the government-controlled wallet in Arlington, Virginia, and confirmed that this wallet received 143,250 USDT.

111.     On May 16, 2025, the FBI executed a warrant to search Karimov's residence in Fairfax, Virginia, and discovered $12,500 in cash that, based on the serial numbers, were identified by the FBI as bills provided by CHS 3 to C-18 on May 9, 2025. Based upon the above information, I believe that Khamza and Karimov coordinated to have C-18 robbed.

Conclusion

112.     Based on facts described above, there is probable cause to believe that, between January 2023 and May 2025, Abu Khamza (also known as Javokhir Norkobilov), Mirzobek Bekmuratov, and Kazi Haidar Ali conspired to engage in money laundering, in violation of Title

18, United States Code, Section 1956(h), and for conducting financial transactions to conceal or disguise the nature, location, source, ownership, or control of property represented to be the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(3)(B).

_____
Christina Hagenbaugh
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to in accordance with
Fed. R. Crim. P. 4.1, by telephone, on this
16th day of September 2025

Digitally signed by Ivan Davis
Date: 2025.09.16 13:06:56 -04'00'
_____
Ivan D. Davis
United States Magistrate Judge